**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TAYLOR CONDARCURE**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:12cv1453 |
| | ) | **Electronic Filing** |
| **CITY OF PITTSBURGH, CHIEF OF** | ) | |
| **POLICE NATHAN HARPER,** | ) | |
| **OFFICER DAVID HONICK, OFFICER** | ) | |
| **MATTHEW R. WHITE, OFFICER R.** | ) | |
| **SEMONLINSKI, DETECTIVE** | ) | |
| **LEBEDDA, OFFICER M. KAIL,** | ) | |
| **SR STATION SQUARE LLC** t/d/b/a | ) | |
| **SADDLE RIDGE SALOON** and/or | ) | |
| **SR PITT LLC** t/d/b/a **SADDLE RIDGE** | ) | |
| **SALOON** and **SADDLE RIDGE** | ) | |
| **SALOON, INC.,** | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION</u>**

February 18, 2015

This federal civil rights action arises from an incident which occurred in the early

morning hours of February 28, 2010 and which culminated in the arrest of, and physical injuries

to, Plaintiff Taylor Condarcure at the hands of Pittsburgh police officers.  Named as defendants

in this case are the City of Pittsburgh, Chief of Police Nathan Harper, Officer David Honick,

Officer Matthew White, Officer "R. Smolinski,"[1] "Detective Lebedda," and Officer "M. Kail."

Also named as defendants are SR Station Square LLC, t/d/b/a Saddle Ridge Saloon and/or t/d/b/a

---

[1] Both the caption of the complaint and the docket in this case erroneously designate Officer Smolinski as "Officer R. Semonlinski."  For purposes of this opinion, the Court will use the correct spelling of the officer's surname.

SR Pitt LLC and Saddle Ridge Saloon, Inc. (hereinafter, "Saddle Ridge" or "Saddle Ridge Saloon").

Presently pending before the Court is a motion for partial summary judgment filed jointly on behalf of Defendants Honick, White, Smolinski, Lebedda, and Kail as well as Chief Nathan Harper and the City of Pittsburgh (ECF No. 31). For the reasons that follow, the motion will be granted in part and denied in part.

## I.   Factual and Procedural Background[2]

On the evening of February 27, 2010, Plaintiff and approximately twenty-five (25) other individuals from Apollo, Pennsylvania travelled in a party bus to Station Square in the City of Pittsburgh to celebrate a friend's birthday. (DCSMF ¶1; Condarcure Depo. 24:1-16, ECF No. 32-2.)[3] Plaintiff was accompanied by his then-fiancee, Lexa Lockhart. (Condarcure Depo. 22:4-14, ECF No. 32-2.) The group was initially dropped off at Buckhead's, a bar in Station Square. (DCSMF ¶2.) After finishing at Buckhead's, Plaintiff went to a nearby bar and club called the Barroom. (DCSMF ¶3.)

That same night, Pittsburgh city police officers Honick, White, Semonlinski, and Kail were working security just outside of the Saddle Ridge Saloon, which was part of the same complex as the Barroom. (DCSMF ¶4; Condarcure Depo. 30:8-19, ECF No. 32-2.) At approximately 1:30 a.m., the officers were summoned inside by a Saddle Ridge bouncer who

---

[2] The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

[3] References to "DCSMF ___" refer to the Defendants' Concise Statement of Material Facts (ECF No. 33) and Plaintiff's responses thereto (ECF No. 37). Citations to the deposition testimony refer to the original page numbering appearing internally in the transcript of the deposition.

requested the officers' assistance in removing a group of people from the bar.  (Honick Depo. 55:19-25, ECF No. 32-3; Condarcure Depo. 31:4-7, ECF No. 32-2; *id.* at 58:18-21, ECF No. 39-9.)  Officers Honick, Smolinski, White, and Kail went inside to assist, while Defendant Lebedda was off doing something else.  (Honick Depo. at 56:1-9, ECF No. 32-3.)  By this time, Plaintiff had come from the Barroom to the Saddle Ridge Saloon to meet the other people in his group.  (Condarcure Depo. 32-3, *id.* at 58:18-21, ECF No. 39-9.)

There is no dispute that, once inside the bar, Honick had an encounter with Plaintiff that resulted in Honick punching Plaintiff in the face and White taking Plaintiff to the floor with a "leg sweep" maneuver.  However, the parties dispute the circumstances surrounding the incident.

Defendant Honick claims that, as the officers approached the group, many members of the group were yelling at the Saddle Ridge security guards.  (Honick Depo. 60:10-12, 61:2-25, ECF No. 32-3.)  One of the security guards, Shannon Deems, pointed to the group, which included Plaintiff, and stated that they needed to leave.  (*Id.* at 66:1-15, 67:8-21.)

According to Honick, Plaintiff was standing near the bar when Honick approached him and told him he had to leave the bar.  (Honick Depo. at 65:12-23, 67:23-25, ECF No. 32-3.)  Plaintiff did not say anything but simply ignored the instruction and turned his back to Honick.  (*Id.* at 68:1-5.)  After confirming with Deems that Plaintiff was with the group that needed to leave, Honick again tapped Plaintiff on the shoulder and told him he had to leave.  (*Id.* at 68:17-69:4.)  At this point, Honick claims, Plaintiff turned around and stated, "I didn't do anything and I'm not going anywhere."  (*Id.* at 69:4-6.)  Honick then instructed Plaintiff for a third time that he had to leave the bar (*id.* at 71), and Plaintiff again stated, "I'm not leaving.  I didn't do anything."  (*Id.* at 71:7-10.)  At this point, Honick grabbed Plaintiff's bicep to escort him out.  (*Id.* at 71:11-12.)  Plaintiff then flexed his bicep and took two steps toward the door.  (*Id.* at

71:15-25.)  At that point, Honick loosened his grip, and Plaintiff turned around and grabbed Honick.  (*Id*. at 72:1-3, ECF No. 42-4.)  According to Honick, Plaintiff got right in his face, grabbed both of his shoulders, shoved Honick, and yelled "get the fuck off me" or words to that effect (*id*. at 79:1-12, ECF No. 42-4), leading Honick to believe that Plaintiff was going to assault him.  (*Id*. at 80:1-5, ECF No. 42-4.)

Defendants White, Kail, and Smolinski generally corroborate Honick's claim that Plaintiff became physically aggressive toward him during this exchange.  White claims that Plaintiff took an unsuccessful swing at Honick (White Depo. at 42:11-24 , ECF No. 42-1; *id*. at 44:1-6, ECF No. 32-5), while Kail claims that Plaintiff actually struck Honick (Kail Depo. at 33:7-23, ECF No. 42-2).  Smolinski maintains that he saw Plaintiff turn and grab Honick. (Smolinski Depo. at 25:23-25, ECF No. 39-7; *id*. at 30:7-10, ECF No. 42-3.)  At this point, according to the officers, Honick struck Plaintiff in the face and Defendant White took Plaintiff to the ground.  (Honick Depo. at 96:2-19, ECF No. 32-3; Kail Depo. at 33:7-23 ECF No. 42-2; White Depo. at 44:21-25, 45:1-2, ECF No. 32-5.)  Defendant White claims that Plaintiff stumbled backward after being hit but did not release his grip on Honick and started to pull Honick to the ground with him; White then pulled Plaintiff's right hand off of Honick's shirt and performed an arm bar leg sweep.  (White Depo. 44:21-45:22, ECF No. 32-5.)

Once the officers had Plaintiff on the ground, some of the crowd began screaming and yelling at the officers.  (Honick Depo. at 100:16-18, ECF No. 32-3.)  Because the crowd was getting very agitated, Honick and White waited for other officers to get the crowd outside before they took Plaintiff out in handcuffs.  (*Id*. at 100:1-8, ECF No. 32-3.)  Once outside, Honick formed the impression that Plaintiff was highly intoxicated.  (*Id*. at 109:1-7.)  According to Honick, Plaintiff was shouting to the crowd and shouting expletives at the officers; he also

4

refused to give any identifying information to the officers and refused a medic. (*Id*. at 106:2-7, 107:18-19, ECF No. 42-4; *id*. at 109:10-110:3, ECF No. 32-3.)

Plaintiff, on the other hand, gives a different account of these events.  Plaintiff contends that, just before his encounter with Honick, he had approached some friends at the bar area and told them that he and Lockhart were planning to leave in order to get some food at another establishment. (Condarcure Depo. 32:14-18, ECF No. 32-2.)  Plaintiff claims that he was in the process of walking away from the bar area toward another friend when Honick approached him and said, "I told you to leave multiple times.  You have to go."  (*Id*. at 34:2-18.)  Plaintiff denies that Honick had previously instructed him to leave the bar and he was unaware of anyone else being directed to leave.  (*Id*. at 34:19-21, 35:22-36:1, 48:11-25, 71:13-16.)  Consequently, after Honick accosted him, Plaintiff replied, "Wow.  What did I do?  I didn't do anything," (*Id*. at 36:10-11), and turned his back to Honick.  (*Id*. at 36:12-13, 37:5-7.)  Honick then said, "I'm not going to tell you again, leave," (*id.* at 36:19-20), to which Plaintiff replied, "Fuck off, faggot." (*Id*. at 36:21-24.)  At that point Honick, who was just a couple feet away, "bull rushed" Plaintiff, knocking Lockhart to the ground and striking Plaintiff in the face with his fist.  (Condarcure Depo. at 36:25-37:1, 42:4-20, ECF No. 32-2; *id.* at 41:7-23, ECF No 39-9; Lockhart Depo. at 38:11-14, ECF No. 39-10.)

According to Plaintiff, the blow caused him to stagger backwards, at which point he was grabbed from behind by Officer White, who took Plaintiff to the floor with a leg sweep. (Condarcure Depo. at 42:23-43:13, 43:25-44:12, 75:14-17, ECF No. 32-2.)  In effectuating this move, Officer White held Plaintiff in a "reverse bear hug" (*id.* at 43:25-44:5), pinning Plaintiff's arms to his side, and tripped him, causing Plaintiff to strike the floor face first.  (*Id.* at 44:11-45:13.)  Plaintiff was then handcuffed, bleeding, and taken out of the building.  (*Id.* at 46:7-9.)

Once outside, Plaintiff turned to Lockhart and instructed her to call his mother. (Condarcure Depo. 50:20-51:1, ECF No. 32-2.)  At that point, Honick, who had his forearm to Plaintiff's shoulder blades, instructed Plaintiff to stop "resisting" and pushed Plaintiff face first up against a brick wall.  (*Id.* at 50:13-51:23.)

Plaintiff was then taken to the Allegheny County jail, where he was processed and held for approximately twelve hours.  (Condarcure Depo. at 54:23- 57:10, ECF No. 32-2.)  During that time, he was not examined or treated for injuries.  (*Id.* at 55:24-56:11.)  He appeared before a district justice by video the following afternoon and was released on bond after learning that he was being charged with resisting arrest, aggravated assault, and defiant trespass.  (*Id.* at 57:25-58:17, ECF Nos. 32-2 and 39-9.)

After his release from jail, Plaintiff went directly to Allegheny General Hospital, where he was diagnosed with a broken nose and a fracture of his left orbital bone.  (Condarcure Depo. at 11:2-15, 59:3-10, ECF No. 39-9.)  Plaintiff underwent surgery approximately two weeks thereafter to repair his orbital fracture.  (*Id.* at 11:18-12:12.)  He was eventually acquitted on all of his criminal charges following a non-jury trial.  (*Id.* at 70:25-71:7, ECF No. 32-2.)

Based on the foregoing events, Plaintiff filed the instant lawsuit in the Allegheny County Court of Common Pleas.  The case was removed to this Court on October 4, 2012.  (ECF No. 1.)

In his complaint, Plaintiff asserts federal claims under 42 U.S.C. §1983 and seeks money damages for the alleged violation of his rights under the First, Fourth and Fourteenth Amendments to the U.S. Constitution.  (Compl. ¶30 and p. 10, ECF No. 1-2.)  As originally pled, the complaint alleged the following constitutional violations:  (1) retaliation against Plaintiff for his exercise of constitutionally protected speech, (2) an unreasonable seizure in the form of a false arrest, (3) an unreasonable seizure by virtue of the use of excessive force, and (4) an

unreasonable seizure in the form of malicious prosecution.  (*Id.* ¶ 30.)  The complaint also asserted §1983 claims against the City of Pittsburgh and Defendant Harper for these alleged violations based on theories of municipal and supervisory liability.  (*Id.* ¶¶ 9-11, 30.)  Finally, the complaint alleged claims under Pennsylvania law for false arrest, assault, battery, and malicious prosecution.  (*Id.* ¶31.)

On July 15, 2014, the moving Defendants filed the instant motion for partial summary judgment (ECF No. 31) and supporting materials (ECF Nos. 32 and 33).  In their motion, Defendants do not challenge Plaintiff's claim against Officer Honick for the alleged use of excessive force.  However, Defendants assert that Plaintiff cannot establish a cause of action for false arrest and malicious prosecution because, as a matter of law, probable cause existed relative to the charge of defiant trespass.  (Defs.' Mot. Summ. J. ¶3, ECF No. 31.)  Defendants next argue that Plaintiff's First Amendment retaliation claim fails as a matter of law because:  (a) Plaintiff has not produced any evidence that the actions taken by Officer Honick were in response to his protected activity; (b) the defiant trespass claim was supported by probable cause; and (c) Plaintiff did not engage in protected speech.  (*Id.* ¶¶ 4-6.)  Third, Defendants argue that there is insufficient evidence to establish any liability on the part of Defendants Lebedda, Kail, Smolinski, and White inasmuch as the evidence does not establish any conduct on their part that would amount to a violation of Plaintiff's constitutional rights.  (*Id.* ¶7.)  Fourth, Defendants argue that the officers in question are entitled to qualified immunity because they acted as reasonably well-trained officers and took reasonable steps under the totality of circumstances.  (*Id.* ¶8.)  Finally, the moving Defendants argue that summary judgment must be entered as to the claims against the City of Pittsburgh and Defendant Harper because there is insufficient evidence to support a basis for municipal or supervisory liability.  (*Id.* ¶¶ 9-10.)

Plaintiff filed his materials in opposition to the pending motion on September 10, 2014 (ECF Nos. 36, 37, 38, 39).  In his brief, Plaintiff indicates that he is voluntarily withdrawing his claims for false arrest and malicious prosecution as well as his claims against Officers Kail, Smolinski, and Lebedda.  (*See* Pl.'s Br. Opp. to Defs.' Mot. Summ. J. at p. 1, n.1, ECF No. 36.) As a result, Plaintiff's only remaining §1983 claims against the moving Defendants are:  (1) a claim against Defendant Honick for the alleged use of excessive force; (2) a claim against Defendant Honick for alleged First Amendment retaliation; (3) a claim against Defendant White for the alleged use of excessive force; (4) a claim against the City of Pittsburgh for municipal liability; and (5) a claim against Defendant Harper based on supervisory liability.  As to Plaintiff's state law claims, it appears that the only remaining causes of action are Plaintiff's claims against Defendants Honick and White for common law assault and battery, neither of which are the subject of the pending motion.

On September 30, 2014, the moving Defendants filed their materials in reply to Plaintiff's submissions (ECF Nos. 41, 42, 43).  Accordingly, the issues raised in the pending motion are now adequately joined and ripe for disposition.


**II.  Legal Standard for Summary Judgment**

Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh,* 613 F.3d 380, 387 (3d Cir. 2010).  Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup,* 413 F.3d 359, 363 (3d Cir. 2005).  Material facts are those that will affect the outcome of the trial

under governing law. *Anderson,* 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *American Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.,* 260 F.3d 288, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 n. 11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position – there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir. 1993).

### III. Discussion

Plaintiff's federal claims are brought pursuant to 42 U.S.C. §1983, which affords a private right of action as against:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws ...

42 U.S.C. §1983.  This statute does not create substantive rights but instead "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir.1996).

To state a viable claim under 42 U.S.C. § 1983, a plaintiff "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *Lomax v. U.S. Senate Armed Forces Service Committee,* 454 F. App'x 93, 95 (3d Cir. 2011) (*quoting West v. Atkins*, 487 U.S. 42, 48 (1988)).  The parties do not presently dispute that the defendant officers were acting under color of state law during the events in question, so the Court's analysis will focus solely on whether Plaintiff has produced sufficient evident to support a finding that his constitutional rights were violated.

A.    <u>Plaintiff's First Amendment Retaliation Claim</u>

We first consider Plaintiff's claim that Defendant Honick retaliated against him for engaging in speech that was protected by the First Amendment.  To establish a viable retaliation claim, a claimant must prove that (1) he engaged in constitutionally protected conduct, (2) he suffered adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) the protected conduct caused the retaliatory action.  *Haley v. Kintock Group,* 587 F. App'x 1, 4 (3d Cir. 2014) (*citing Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)).

10

Here, Defendants challenge the first and third elements of Plaintiff's retaliation claim. As to the first element, Defendants assert that Plaintiff did not engage in any constitutionally protected speech. As to the third element, Defendants argue that Plaintiff has failed to show that the use of force occurred in response to Plaintiff's speech. In addition, Defendants argue that the existence of probable cause for Plaintiff's arrest defeats his retaliation claim.

   1.   *Did Plaintiff Engage in Constitutionally Protected Speech?*

Defendants argue that Plaintiff's retaliation claim fails as a matter of law because, even accepting Plaintiff's version of events, he did not engage in constitutionally protected speech. Defendants characterize the Plaintiff's alleged utterance of "Fuck off, faggot," as "obscenity" or "fighting words" – categories of speech that have long been recognized as outside of the realm of constitutional protection). *See Chaplinsky v. New Hampshire,* 315 U.S. 568, 572 (1942) ("First Amendment protection does not extend to the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words[.]").

Plaintiff cites numerous decisions in which other courts have found profane or offensive language directed at law enforcement officers to be protected speech. *See, e.g., Kennedy v. City of Villa Hills,* 635 F.3d 210 (6th Cir. 2011)(calling an officer an "SOB" and a "fat slob"); *Greene v. Barber,* 310 F.3d 889 (6th Cir. 2002)(characterizing an officer as an "asshole" and "stupid"); *Resek v. City of Huntington Beach*, 41 F. App'x 57 (9th Cir. 2002) (shouting abusive comments at officers and answering them with sarcasm); *Corey v. Nassan,* Civil Action No. 05-114, 2006 WL 2773465, at *8-12 (W.D. Pa. Sept. 25, 2006) (gesturing to a police officer with the middle finger); *United States v. McDermott,* 971 F. Supp. 939 (E.D. Pa. 1997) (telling a security officer, "This is bullshit" and "I'm not fucking going anywhere").

Defendants argue that all of the foregoing rulings are distinguishable because, unlike the instant case, they did not involve circumstances where violence was likely to occur as the result of the plaintiff's speech.  Defendants maintain that a more analogous case is *Commonwealth v. Pringle,* 450 A.2d 103 (Pa. Super. Ct. 1982).  In *Pringle,* the Pennsylvania Superior Court considered the direct appeal of a defendant/appellant who had been convicted for disorderly conduct under 18 Pa.C.S.A. §5503(a)(3)[4] after repeatedly shouting "goddamn fucking pigs" at officers in protest of a friend's arrest as a large crowd gathered at the scene.  Acknowledging that, in other contexts, the word "fuck" had to have a sexual connotation in order to be obscene, the court nevertheless held that, in the circumstances before it, where the appellant had called the police officers "goddamn fucking pigs," she had used obscene language within the meaning of the disorderly conduct statute without the need for resorting to the sexual content of the words. 450 A.2d at 106-07.   The court further concluded in *Pringle* that, even if the words were not obscene, they were "fighting words" in that, by their very utterance, they inflicted injury and created a risk of public inconvenience, annoyance, alarm and the incitation of lawless behavior. *Id.* at 107.  Based on these conclusions, the Superior Court upheld the appellant's conviction.  *Id.* at 106-08.

This Court is not persuaded that the reasoning of *Pringle* compels the conclusion, as a matter of law, that Plaintiff's alleged remark to Officer Honick in this case was unprotected speech.  Insofar as the Superior Court found the speech in *Pringle* to be "obscene," we note that this aspect of the court's analysis was refined by its subsequent ruling in *Commonwealth v.*

---

[4] Pursuant to that statute, "[a] person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:  (1) engages in fighting or threatening, or in violent or tumultuous behavior; (2) makes unreasonable noise; (3) uses obscene language, or makes an obscene gesture; or (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor."  18 Pa. C.S.A. §5503(a).

*Bryner,* 652 A.2d 909 (Pa. Super. Ct. 1995).  In *Bryner,* the Superior Court adopted the United

States Supreme Court's test for "obscenity" as set forth in *Miller v. California,* 413 U.S. 15

(1973), for purposes of determining whether conduct or speech is "obscene" under the

Commonwealth's disorderly conduct statute.  *Bryner*, 652 A.2d at 912.  Accordingly, in

determining whether conduct or speech is "disorderly" under Pennsylvania law by virtue of

being "obscene," courts must now consider:  "(a) whether 'the average person, applying

contemporary community standards' would find that the work, taken as a whole, appeals to the

prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual

conduct specifically defined by the applicable state law, and (c) whether the work, taken as a

whole, lacks serious literary, artistic, political, or scientific value." *Id.* (*quoting  Miller v.

California*, 413 U.S. at 24, 93 S. Ct. at 2615)*; see Commonwealth v.McCoy,* 69 a.3d 658, 665

(Pa. Super. Ct. 2013) (applying the *Miller* test for obscenity in connection with Pennsylvania's

disorderly conduct statute).  In light of *Bryner,* the Superior Court's ruling in *Pringle* on the

obscenity issue is of questionable vitality.  *See Clifton v. Borough of Eddystone,* 824 F. Supp. 2d

617, 626 n.4 (E.D. Pa. 2011) (describing *Pringle* as "a nearly 30 year old case that has been

repeatedly called into doubt") (citing authority); *Commonwealth v. Fenton,* 750 A.2d 863, 869-

72 (Pa. Super. Ct. 2000) (Brosky, J. concurring) (discussing *Bryner's* analysis and observing that

it "seems to put an end to the analysis conducted in *Pringle*:).  *See also Brockway v. Shepherd,*

942 F. Supp. 1012, 1016 (M.D. Pa.1996) (holding that motorist who gave police officer the

"middle finger" during a vehicle stop did not engage in "obscene" conduct within the meaning of

the First Amendment and Pennsylvania's disorderly conduct statute; motorist's conduct was not

sexual in nature but was intended instead to be disrespectful and offensive to the police officer);

*United States v. McDermott*, 971 F Supp. at 943 n.11 (naval officer's remark that fellow officers'

conduct was "bullshit" and that he was not "fucking going anywhere," although obscene in everyday parlance, was not obscene in the constitutional sense).

Defendants maintain that Plaintiff's alleged remark to Honick was obscene "not because the word fuck applies to sexual nature, but [because] the phrase taken as a whole is not one of criticism of actions but [a] blatant attempt at crude and crass name calling with no social value." (Defs.' Reply Br. at 2, ECF No. 41.)  The Court finds, however, that Plaintiff's alleged comment to Honick could reasonably be construed on this record as an expression of criticism rather than merely "crude and crass name calling."  If so construed, then Plaintiff's statement is not lacking in social value, since "'[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest [or other retaliation] is one of the principal characteristics by which we distinguish a free nation from a police state.'"  *Johnson v. Campbell,* 332 F.3d 199, 212 (3d Cir. 2003) (*quoting City of Houston v. Hill,* 482 U.S. 451, 462-63 (1987)).

This Court is also not persuaded that Plaintiff's alleged utterance must, as a matter of law, be characterized as fighting words.  The Third Circuit Court of Appeals recently explained that "[t]he unprotected category of speech called 'fighting words' is an extremely narrow one," *Johnson,* 332 F.3d at 212, and the "First Amendment on the whole offers broad protection for speech, be it unpleasant, disputatious, or downright offensive." *Id.*  Consequently, "[t]o be punishable, words must do more than bother the listener; they must be nothing less than 'an invitation to exchange fisticuffs.'"  *Id.* (*quoting Texas v. Johnson*, 491 U.S. 397, 409 (1989).  In fact, "the Supreme Court has suggested that the 'fighting words' exception 'might require a narrower application in cases involving words addressed to a police officer, because a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the

average citizen, and thus be less likely to respond belligerently to fighting words.'"  *Id*. (*quoting*

*City of Houston v. Hill,* 482 U.S. at 462).  Moreover,

> [o]n the specific subject of "profane" words, the Supreme Court has held that even those words alone, unaccompanied by any evidence of violent arousal, are not "fighting words," and are therefore protected speech.  *Cohen v. California*, 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971).  In *Cohen*, the Supreme Court reversed a conviction for disturbance of the peace where the defendant had worn a jacket bearing the words "F–k the Draft" inside a courthouse. Id. at 16, 91 S. Ct. 1780.  The Court held that it was not enough that the jacket might cause others to "rise up to commit a violent act against the person of the defendant or attempt to forcibly remove his jacket."  *Id*. at 17, 91 S. Ct. 1780.  Because the defendant did not threaten anyone or provoke others to acts of violence, he could not be punished. The Court emphasized that even offensive and distasteful words must be protected, for "one man's vulgarity is another's lyric," and courts cannot make principled distinctions on matters of taste and style. Id. at 25, 91 S. Ct. 1780.  It is the function of words to convey "not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well." *Id*. at 26, 91 S. Ct. 1780.  The emotive function of an expletive "may often be the more important element of the overall message sought to be communicated," *Id*.; so long as one does not incite violence, one should not be forced to express one's anger or disapproval in measured terms.

*Johnson,* 332 F.3d at 212-13 (holding that defendant police officer lacked probable cause to

believe that the plaintiff had uttered "fighting words" when the plaintiff muttered the words "son

of a bitch" to the officer during the course of an investigative stop; although the plaintiff's words

were "unpleasant, insulting, and possibly unwise, … they were not intended to, nor did they,

cause a fight," *id.*, and were instead "emotionally expressive of [the plaintiff's] displeasure with

the way [the officer] was handling the situation."  *Id.*

     As other federal courts have observed, a determination as to whether or not speech

constitutes "fighting words" depends highly upon the circumstances in which the words are

uttered.  *See, e.g., Greene,* 310 F.3d at 895 (whether plaintiff had a constitutionally protected

right to call a police officer an "asshole" and castigate him as "stupid" would "depend[] on the

time, place, and manner in which [the plaintiff] so expressed himself"); *Sallie v. Lynk,* No.

2:10cv456, 2012 WL 995245, at *14-15 (W.D. Pa. Mar. 23, 2012) (the analysis as to whether

words of disapproval to a police officer are protected speech cannot be decided "based on consideration of the words in a vacuum," because "context and surrounding circumstances must be taken into account"); *Corey v. Nassan,* 2006 WL 2773465, at *8 ("What counts as constitutionally-protected expression under the First Amendment varies according to the particular context at issue.").

Here, there are genuinely disputed issues concerning the circumstances in which Plaintiff allegedly uttered the offensive words to Honick.  Among other things, there are questions of fact as to whether any bystanders actually heard the words Plaintiff uttered, whether the atmosphere in the bar was such that Plaintiff's remark (as opposed to Honick's conduct) was likely to incite a reaction from the crowd, and whether Plaintiff's words were accompanied by any show of aggression.

For example, the record suggests that the scene of the encounter between Plaintiff and Honick was both noisy because of the loud music and dark because of the nightclub atmosphere. (Kail Depo. 26:4-7, ECF No. 39-8.)  White, who was standing just eight feet away from Honick, testified that he did not hear any verbal exchange between Honick and Plaintiff just prior to the scuffle.  (White Depo. 48:4-18, ECF No. 39-6.)  There is no testimony concerning how loudly Plaintiff spoke when he made his alleged remark, and Honick maintains that he does not recall the remark being made at all.  (Honick Depo. (74:2-6, 74:24-75:5, ECF No. 32-3.)  Accordingly, a jury faced with these facts might reasonably infer that Plaintiff's alleged statement to Honick was not likely to incite a breach of the peace because none of the bystanders that were in close proximity to Plaintiff at the time of his alleged remark would have been able to hear it.

Even if other patrons in the bar were capable of hearing Plaintiff's words, the record here does not compel the conclusion that they were likely to be incited to violence by it.  On this

point, the evidence provides somewhat conflicting accounts concerning the state of the crowd as of the moment that Plaintiff allegedly made his offensive remark. Honick claims that, as the officers first entered Saddle Ridge and approached the group from Apollo, many members of the group were yelling at the security guards.  (Honick Depo. at 60-61.)  White testified that he did not notice anything "out of the ordinary" about the group as he entered the bar, but he claims the group became belligerent with the officers after they approached the group and told them to leave.  (White Depo. 40:13-15, ECF No. 39-6; *id.* at 41:8-19, ECF No. 42-1.)  Smolinski testified that, when he entered Saddle Ridge, the crowd was still standing around, but he did not notice anyone becoming belligerent until after Honick approached Plaintiff.  (Smolinski Depo. at 25:3-14, ECF No. 39-7.)  Kail testified that it was very crowded, dark and noisy inside the bar; he could not see the group and did not witness them being disorderly as he walked in, but a representative of the bar had said that the group was causing problems and he wanted them to leave.  (Kail Depo. 25:5-25, ECF No. 42-2; *id.* at 26:1-7, ECF No. 39-8.)  Plaintiff acknowledges that an argument had previously broken out between members of his group and other bar patrons after someone began talking to his friend Jeremy's girlfriend (Condarcure Depo. at 49:1-13), but he denies that anyone was being ushered out in the moments before his encounter with Honick.  (Condarcure Depo. at 34:19-21, 35:22-36:1, 48:11-25.)  Construing the evidence most favorably to Plaintiff, a jury might reasonably conclude that the bystanders near Plaintiff were not so unruly as to likely be prompted to violence by Plaintiff's words.  Alternatively, a jury might infer that the crowd became significantly agitated only after Honick applied force to Plaintiff.

Finally, there are issues of fact on this record as to whether Plaintiff made any show of aggression in connection with his alleged remark to Honick or otherwise displayed an intent to incite violence.  Honick admits that, prior to their interaction, Plaintiff was not being rowdy and

had not done anything to suggest aggressive or assaultive behavior.  (Honick Depo. at 65:6-11, ECF No. 32-3; *id.* at 69:7-14.)  In addition, Deems did not indicate to Honick that Plaintiff was drunk or had done anything aggressive, violent, or belligerent.  (Honick Depo. at 66:25-67:4, ECF No. 32-3; *id.* at 67:10-15.)   Although the defendant officers claim that Plaintiff grabbed and/or swung at Honick as he was being escorted out, Plaintiff denies this and claims that the punch came immediately after his words without any further provocation.  (Condarcure Depo. 40:22-41:15, ECF No. 39-9; *id.* at 41:24-42:20, ECF Nos. 39-9 and 32-2.)  Plaintiff testified that he had been trying to round up his friends to leave Saddle Ridge at the time that Honick accosted him and he made his offensive remark only because Honick was "being an asshole" and "very, very rude … out of nowhere."  (*Id.* at 39:22-40:21, ECF No. 39-9.)  If a jury were to credit Plaintiff's version of event, it could reasonably infer that Plaintiff's words were intended not to incite physical violence but rather to indicate his displeasure about the way he was being treated and his desire to be left alone.

These competing reasonable inferences make the instant case potentially distinguishable in material respects from *Pringle*.  In *Pringle,* the defendant had repeatedly shouted "goddamn fucking pigs" at officers who were attempting to arrest a resisting individual in the presence of a large crowd that was gathering at the scene.  The Superior Court ruled that the defendant's speech in these circumstances constituted "fighting words" that tended to inflict injury by their very utterance and created a risk of public inconvenience, annoyance, alarm, and the inciting of lawless behavior.  450 A.2d at 107.  Notably, however, the *Pringle* decision was rendered on direct appeal from the defendant's criminal conviction on a record which the court was constrained to view most favorably to the Commonwealth.  *See Commonwealth v. Moore,* 103 A.3d 1240, 1252 (Pa. 2014) ("In determining whether there is sufficient evidence to support a

conviction, the appellate court must view all the evidence and all reasonable inferences drawn therefrom in the light most favorable to the Commonwealth, as verdict winner.") (internal quotation marks and citation omitted).

Here, by contrast, the Court is faced with a contested factual record at the summary judgment stage, where all reasonable inference and factual disputes must be viewed in the light most favorable to the citizen speaker as the non-moving party.  For the reasons previously stated, the record in this case does not permit the Court to determine, as a matter of law, that Plaintiff's alleged remark to Honick was "obscene" language or "fighting words" unprotected by the First Amendment.  Accordingly, summary judgment cannot be granted on that basis.

### 2.  Has Plaintiff Produced Sufficient Evidence of Causation?

Defendants also challenge Plaintiff's retaliation claim on the basis of causation.  As to this point, Defendants argue that Plaintiff has failed to produce any evidence that the use of force occurred in response to his alleged statement, "Fuck off, faggot," and, moreover, Honick testified that he does not recall such a statement being made.

The Third Circuit Court of Appeals has recently explained that:

[t]o establish the requisite causal connection [in a First Amendment retaliation claim], the plaintiff must prove either:  "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir.2007) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503–04 (3d Cir.1997)). "In the absence of that proof the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of the fact [sic] should infer causation." *Id.* (*quoting Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir.2000)). The defendant must be aware of the protected conduct in order to establish the requisite causal connection. *Gorum v. Sessoms*, 561 F.3d 179, 188 (3d Cir. 2009) (*citing Ambrose v. Twp. of Robinson,* 303 F.3d 488, 493 (3d Cir.2002)).

*Cooper v. Menges*, 541 F. App'x 228, 232 (3d Cir. 2013).  In this case, Plaintiff's testimony

supports a reasonable inference that Honick's blow came immediately after Plaintiff uttered the

words, "Fuck off, faggot."  Lockhart similarly testified that, immediately after Plaintiff spoke,

Honick "plowed into [her], knocked [her] on the floor…, and grabbed [Plaintiff]."  (Lockhart

Depo. 38:11-14, ECF No. 39-10.)  This "unusually suggestive temporal proximity" is sufficient

to establish the requisite causal connection between the allegedly protected speech and the

allegedly retaliatory conduct.  Moreover, despite his denial of any recollection that Plaintiff

uttered the statement in question, Honick's close physical proximity to Plaintiff supports a

reasonable inference that Honick heard, and reacted to, Plaintiff's comment.

Defendants also argue that, because there was probable cause for Plaintiff's arrest on

charges of defiant trespass, his retaliation claim fails as a matter of law.  Defendants' argument

may have some force to the extent Plaintiff is alleging that the retaliatory act in question was his

arrest.  *See Hartman v. Moore,* 547 U.S. 250, 265-66 (2006) (where First Amendment retaliation

claim is premised upon an allegedly retaliatory prosecution, the plaintiff must plead and prove

that the prosecution was not supported by probable cause).  However, in his brief in opposition to

the pending motion, Plaintiff seems to abandon any theory to that effect and argues only that

Defendant Honick retaliated against him by punching him in the face.  (*See generally* Pl.'s Br.

Opp. to Defs.' Mot. Summ. J. at 1-3, ECF No. 36.)  The existence *vel non* of probable cause has

no bearing on whether Officer Honick punched Plaintiff in retaliation for allegedly protected

speech and, therefore, summary judgment is not warranted on this basis.

In sum, Plaintiff has presented sufficient evidence from which a jury could reasonably

conclude that he engaged in constitutionally protected speech and that Honick forcefully

punched him in retaliation for that speech.  Because the evidence is sufficient to support each

element of Plaintiff's First Amendment retaliation claim, Defendants' motion for summary

judgment will be denied as to that aspect of Plaintiff's §1983 claim.

B.  Plaintiff's Excessive Force Claim Against Officer White

Defendants next move for summary judgment with respect to Plaintiff's Fourth

Amendment claim against Defendant White predicated on the alleged use of excessive force.[5]

Defendants contend that Plaintiff has failed to identify any actions on the part of Officer White

that would amount to a constitutional violation.  They further argue that the actions taken by

Office White were not the proximate cause of any injury to Plaintiff.

"To state a claim for excessive force as an unreasonable seizure under the Fourth

Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable."

*Abraham v. Raso,* 183 F.3d 279, 288 (3d Cir. 1999).   Because Plaintiff was clearly "seized" by

virtue of his arrest, the issue becomes whether that seizure was "reasonable."

The "reasonableness" analysis is an objective one which takes into account the totality of

circumstances confronted by the officer.  *See Patrick v. Moorman,* 536 F. App'x 255, 258 (3d

Cir. 2013) ("Excessive force must be examined objectively since officers must use force that is

objectively reasonable from the perspective of a reasonable officer") (*citing Graham v. Connor,*

490 U.S. 386, 396-97 (1989)); *Johnson v. Watson,* 113 F. App'x 482, 486 (3d Cir. 2004) ("[T]he

question is whether the officers' actions were 'objectively reasonable' in light of the facts and

circumstances confronting them, without regard to their underlying intent or motivation.")

(*quoting Graham,* 490 U.S. at 397 (1989)).  In *Graham v. Connor,* the Supreme Court identified

specific factors that courts must consider, including:  (1) "the severity of the crime," (2) the

_____

[5] The alleged use of excessive force by Defendant Honick is not the subject of the pending motion except insofar as
Defendants assert protection under the doctrine of qualified immunity.

"immediate threat" posed by the suspect to officers or others, and (3) whether the suspect was

"actively resisting arrest" or "evad[ing] arrest by flight." *Graham*, 490 U.S. at 396. The Third

Circuit Court of Appeals has expanded the list of relevant considerations to include: (a) whether

the suspect is "violent or dangerous," (b) the "duration" of the force, (c) whether the force was

used to make an arrest, (d) the "possibility" that the suspect is armed, and (e) the number of

people with whom the police must contend. *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d

Cir.1997); *see Patrick v. Moorman,* 536 F. App'x at 258. The Supreme Court has stated that:

> [t]he 'reasonableness' of a particular use of force must be judged from the
> perspective of a reasonable officer on the scene, rather than with the 20/20 vision
> of hindsight.... The calculus of reasonableness must embody allowance for the
> fact that police officers are often forced to make split-second judgments—in
> circumstances that are tense, uncertain, and rapidly evolving—about the amount
> of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396–97. "[R]easonableness under the Fourth Amendment should

frequently remain a question for the jury, … however, defendants can still win on summary

judgment if the district court concludes, after resolving all factual disputes in favor of the

plaintiff, that the officer's use of force was objectively reasonable under the circumstances."

*Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (internal quotation marks and citations omitted)

(alteration in the original).

    In this case, consideration of the relevant factors could reasonably lead to the conclusion

that Officer White's use of force was excessive under the circumstances and, therefore, violated

Plaintiff's Fourth Amendment rights. On the one hand, White applied the leg sweep only briefly

and used it in connection with Plaintiff's arrest; on the other hand, however, the alleged crime

underlying the arrest was not particularly severe since, under the present facts, defiant trespass

constitutes only a third degree misdemeanor. *See* 18 Pa. C.S.A. §3503(b)(1)(i) and (b)(2).

Although White claims that he took Plaintiff to the floor only after witnessing a scuffle in which Plaintiff began to pull Honick over, the issue of whether Plaintiff ever laid hands on Honick is disputed.  Accepting Plaintiff's version of the events, one could reasonably infer that Plaintiff never touched Honick and posed no immediate threat to the officers' safety in the moments before he was struck and tackled, having done nothing more than utter offensive words.  While Plaintiff's conduct was certainly disrespectful to Honick, a jury could nevertheless interpret his behavior as outwardly consistent with his professed intention to gather his friends and leave the scene.  Further, a jury could conclude that Plaintiff was not actively resisting or attempting to evade arrest and, in fact, had no time at all to react between the moment that Honick struck him and the moment that White grabbed him from behind and took him to the floor.  Finally, a jury crediting Plaintiff's testimony could infer that the officers did not have a large number of other individuals to contend with at the time Plaintiff was arrested.  This point is disputed because Defendants claim that the incident occurred as the officers were being asked to usher an unruly crowd out of the bar.  However, Plaintiff denies that others were being directed out of the bar, and he claims that the only disturbance involved an argument between his friend Jeremy and a bar patron who was talking to Jeremy's girlfriend.  In sum, the evidence, when construed most favorably to Plaintiff, establishes that Officer Honick, who was substantially larger than Plaintiff,[6] forcefully punched Plaintiff in the face without any physical provocation, causing Plaintiff to stagger backwards into the arms of Officer White, who then pinned Plaintiff's arms to his sides and took him to the floor, face-first, with a leg sweep.  Based on the totality of factors, a

---

[6]  In this regard, the Court notes there is evidence in the record establishing that Honick is more than six feet-four inch**es** tall and weighs over 250 pounds, whereas Plaintiff is approximately 6 feet tall and weighed 170 pounds at the time of the incident in question.  (Condarcure Depo. 39:1-5, ECF No. 39-9, *id.* at 76:20-77:1, ECF No. 32-2.)

jury could conclude that this use of force by Officer White was objectively unreasonable and, therefore, violated Plaintiff's Fourth Amendment rights.

Defendants contend that Plaintiff's excessive force claim must nevertheless fail because there is no evidence that White's actions were the proximate cause of Plaintiff's physical injuries.  However, an excessive force claim does not have to be premised on actual physical injury. *See Velius v. Twp. of Hamilton,* 466 F. App'x 133, 137 (3d Cir. 2012) (noting that Supreme Court and Third Circuit precedent have "clearly established … that excessive force need not cause injury to be actionable under the Fourth Amendment") (citing authority); *Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir. 1997) ("We do not agree that the absence of physical injury necessarily signifies that the force has not been excessive, although the fact that the physical force applied was of such an extent as to lead to injury is indeed a relevant factor to be considered as part of the totality.") (citing cases), *abrogated on other grounds by Curley v. Klem,* 499 F.3d 199 (3d Cir. 2007).   Because there is a genuinely disputed issue of material fact as to whether the force applied by Officer White was objectively unreasonable, summary judgment is inappropriate.

C.  Defendants' Assertion of Qualified Immunity

Defendants next argue that summary judgment is appropriate on the basis of qualified immunity because the defendant officers "acted as reasonably well-trained officers."  (Defs.' Br. Supp. Mot. Summ. Judg. 8, ECF No. 32.)  Based on the Court's review of the moving Defendants' initial and reply briefs, it appears they are asserting the qualified immunity defense only in connection with Plaintiff's Fourth Amendment claims premised on his arrest and the officers' application of force in connection therewith.  Because Officers Smolinski, Kail, and

Lebedda are being dismissed from this case, the Court need not address the qualified immunity

argument relative to the actions of those Defendants.  In addition, because Plaintiff is

withdrawing his Fourth Amendment claim premised on false arrest, the Court need not address

qualified immunity in that context.  As to the remaining defendant officers, it appears that

qualified immunity is being asserted only with respect to the Defendant Honick's and Defendant

White's respective uses of force against Plaintiff. [7]

"Qualified immunity shields government officials from civil damages liability unless the

official violated a statutory or constitutional right that was clearly established at the time of the

challenged conduct." *Reichle v. Howards*, —— U.S. ——, 132 S. Ct. 2088, 2093 (2012).  The

qualified immunity analysis is a two-step process, which a court may address in either order

according to its discretion.  *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d

565 (2009).  Step one involves a determination whether the facts, taken in the light most

favorable to the plaintiff, establish that the defendant's conduct "violated a constitutional right."

*Dougherty v. School Dist. of Phila.,* 772 F.3d 979, 993 (3d Cir. 2014) (*quoting Saucier v. Katz*,

533 U.S. 194, 201 (2001)).  Step two involves a determination as to whether that right was

"clearly established" at the time of the challenged conduct.  *Id*. (*quoting Saucier,* 533 U.S. at

201).  "The relevant, dispositive inquiry in determining whether a right is clearly established is

---

[7] Defendants do not appear to be asserting the defense of qualified immunity relative to Plaintiff's First Amendment retaliation claim; accordingly, the Court will not address this theory at any length, other than to note that First Amendment's bar on retaliation for protected speech "has long been clearly established." *Crawford-El v. Britton,* 523 U.S. 574, 592 (1998).  In addition, the legal principles that are laid out in the rulings cited by this Court and which govern our analysis of whether Plaintiff's utterance constitutes "protected speech" were published well in advance of the incident in question.  Moreover, qualified immunity cannot serve as a basis for summary judgment where, as here, application of the defense depends upon a jury's resolution of disputed issues of historical fact. *See Monteiro v. City of Elizabeth,* 436 F.3d 397, 405 (3d Cir. 2006) ("[W]hen qualified immunity depends on disputed issues of fact, those issues must be determined by the jury.").

whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

Here, Defendants contend that Honick is entitled to qualified immunity because, at the time of the incident in question, no case law existed that would have put Honick on notice "that the use of a single punch when the officer believed he has no other means of releasing the grip of an individual" would constitute excessive force. (Defs.' Br. in Reply to Pl.'s Br. in Opp. at 3, ECF No. 41.) In similar fashion, Defendants argue that no case law existed to put White on notice that "the use of a leg sweep with a noncompliant individual was in violation of an individual's rights." (*Id.* at 3-4.)

The doctrine of qualified immunity does not require, as Defendants suggest, "that the very action in question has previously been held unlawful." *Dougherty,* 772 F.3d at 993 (*citing Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Rather, the defense may be overcome if "the 'contours of the right' [are] sufficiently clear such that the unlawfulness of the action is apparent in light of pre-existing law." *Id.* (quoting *Anderson,* 483 U.S. at 640). The law which governs this Court's analysis of Plaintiff's excessive force claim was well established as of the date of the incident in question. *See Suarez v. City of Bayonne,* 566 F. App'x 181, 187 (3d Cir.2014) (reversing district court's grant of qualified immunity on excessive force claim and observing that "'[t]he factors relevant to the excessive force analysis are well-recognized'") (*quoting Couden v. Duffy,* 446 F.3d 483, 497 (3d Cir. 2006)).

Moreover, the Defendants' qualified immunity argument assumes key facts that are presently disputed. Although Honick claims he applied a single punch because he had no other means of releasing Plaintiff's grip, there is a dispute on this record as to whether or not Plaintiff ever laid hands on Honick or otherwise physically provoked or threatened Honick. In addition,

there is a dispute as to the degree of force used by Honick.  While Officer White described

Honick's punch as a "six-inch jab" (White Depo. 44:20, ECF No. 32-5), Plaintiff's testimony

suggests that Honick "wound up" for the punch by bringing his fist behind his shoulder.

(Condarcure Depo. 42:11-13, ECF No. 32-2.)  Similarly, notwithstanding White's representation

that he used the leg sweep because Plaintiff was being noncompliant and struggling with Honick

(*see* Defs.' Br. Supp. Mot. Summ. J. at 9, ECF No. 32; Defs.' Br. in Reply to Pl.'s Br. Opp. at 3-

4, ECF No. 41), there is a disputed issue of fact as to whether or not Plaintiff struggled with

Honick at any point prior to White's application of force.

A granting of qualified immunity is inappropriate at the summary judgment stage if the

analysis depends upon the resolution of historical facts which are disputed on the record.  *See*

*Johnson v. Jones,* 515 U.S. 304, 313 (1995) (qualified immunity may turn on disputed issues of

fact."); *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) ("when qualified

immunity depends on disputed issues of fact, those issues must be determined by the jury");

*Karnes v. Skrutski,* 62 F.3d 485, 491 (3d Cir. 1995) ("While the qualified immunity defense is

frequently determined by courts as a matter of law, a jury should decide disputed factual issues

relevant to that determination.").  Because there are disputed issues in this case bearing on the

material historical facts which led to the use of the force, as well as disputes as to the nature of

the force applied, the Court cannot determine, as a matter of law, that the officers are qualifiedly

immune relative to Plaintiff's Fourth Amendment excessive force claim.  Accordingly,

Defendants' motion for summary judgment will be denied with respect to the excessive force

claims against Honick and White.

D.  Municipal Liability

27

Finally, the Court considers the Defendants' motion for summary judgment relative to Plaintiff's claims against Defendant Harper and the City of Pittsburgh.  Under §1983, municipalities are not subject to *respondeat superior* liability.  *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691-94 (1978).  Rather, in order to demonstrate municipal liability under §1983 for the violation of a plaintiff's constitutional rights, the plaintiff must show that a government policy or custom itself was the "moving force" behind the constitutional injury.  *Id.,* at 694-95; *see also Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) ("municipal liability attaches only when 'execution of a government's policy or custom … inflicts the injury.'") (*quoting Monell*, 436 U.S. at 694).  Individual defendants who are policymakers may similarly be liable under § 1983 "if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'"  *A.M. ex re. J.M.K. v. Luzerne County Juvenile Det.Ctr.,* 372 F.3d 572, 586 (3d Cir. 2004) (*quoting Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir.1989)) (alteration in the original).

Proving a government policy or custom can be accomplished in a number of different ways.  *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).  "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy or edict."  *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir.1990) (*quoting Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986)) (alteration in the original).  Custom or practice, in contrast, can be proven by demonstrating that a given course of conduct, although not authorized by law, is "'so permanent and well settled' as to virtually constitute law."  *Id*. (*quoting Monell*, 436 U.S. at 690).

28

To establish municipal liability pursuant to § 1983, the plaintiff must identify the policy, custom or practice of the municipal defendant that results in the constitutional violation. *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403-04 (1997).   Further, the plaintiff must show that, "through its *deliberate* conduct, the municipality was the 'moving force' behind the alleged injury." *Id.* at 404.   Specifically, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of rights." *Id.*   The "requisite degree of culpability" requires proof "that the municipal action was taken with deliberate indifference to its known or obvious consequence." *Id.* at 407 (internal quotations and citation omitted); *see also City of Canton v. Harris*, 489 U.S. 378, 389 (1989).   "A showing of simple or even heightened negligence will not suffice." *Brown,* 520 U.S. at 407.

In his complaint, Plaintiff alleged that the "City of Pittsburgh has a custom, policy or practice of deliberate indifference to the violation of constitutional rights committed by its police officers engaged in so-called off-duty employment." (Compl. ¶ 1, ECF No. 32-6.)  Plaintiff further alleged that the City was aware that its police officers, while engaged in secondary, private employment, had "carried out false arrests, used excessive force and/or filed false, malicious criminal charges against citizens" (*id.* ¶10), but, despite this knowledge, the "City of Pittsburgh has with deliberate indifference failed to take adequate precautions to protect citizens from the abusive practices of its police officers engaged in secondary employment, including the failure to adequately train, discipline, supervise, and/or monitor such employment." (*Id.* ¶11.)[8]

---

[8] The complaint does not make any averments as to Defendant Harper personally, but appears instead to name him as a defendant solely in his official, policy-making capacity as (then) chief of the Pittsburgh Bureau of Police.

Despite these allegations, Plaintiff has failed to adduce proof that the policy, practice or custom identified in the complaint served as the "moving force" behind his own alleged injuries.[9]

Instead, in his brief opposing the pending motion for partial summary judgment, Plaintiff attempts to demonstrate a municipal "custom" or "practice" involving the City's alleged failure to adequately train or discipline Defendant Honick relative to the appropriate use of force and/or appropriate interactions with members of the general public.  According to Plaintiff, the City and Harper were aware of both (1) a generalized problem with Honick using excessive force and/or interacting inappropriately with the public, and (2) a specific pattern of Honick punching civilians in the face during the course of his police duties.  Plaintiff claims that, despite this knowledge, the City failed to address these problems and was thereby deliberately indifferent to the rights of those with whom Honick was likely to come into contact.  In support of this theory, Plaintiff points to records generated by the Office of Municipal Investigations ("OMI") as well as records from a COMPSTAR Report that was generated in connection with a consent decree between the City of Pittsburgh and the U.S. Department of Justice.  Having reviewed this evidence, the Court is not persuaded that it supports the existence of an actionable municipal custom or practice.

With regard to the OMI records, Plaintiff points out that Honick was the subject of nine complaints involving the alleged use of excessive force or improper conduct toward the public

---

[9] The record shows that Plaintiff has pointed to only three civil rights lawsuits in which §1983 plaintiffs successfully alleged unconstitutional conduct on the part of city police officers and obtained either a settlement or a verdict.  *See Werling v. Eggleton,* Civil Action No. 2:05-cv-898 (W.D. Pa.); *Kenney v. City of Pittsburgh,* Civil Action No. 2:12-cv-551 (W.D. Pa.); *Moreno v. City of Pittsburgh,* Civil Action No. 2:12-cv-615 (W.D. Pa.).  However, the latter two of these cases involved police misconduct that occurred *after* the date of the incident in question here; thus, the City's response to the misconduct alleged in *Kenney* and *Moreno* could not have served as the moving force behind Plaintiff's alleged injuries in this case.  *See Sallie*, 2012 WL 995245, at *10 ("It is beyond reproach that neither contemporaneous nor subsequent conduct can supply the pattern of violations needed to provide notice to municipal policymakers and an opportunity to conform to constitutional requirements.") (*citing Connick v. Thompson*, 131 S. Ct. 1350, 1361 n.7 (2011)).  The Court finds that the one incident predating Plaintiff's injury in this case is insufficient, as a matter of law, to support the policy identified in the complaint.

between the years 2005 and 2012 (*see* Defs.' Ex. 3, ECF No. 39-3); however only two of these complaints were sustained by OMI.  Of the two "sustained" complaints against Honick, one was the complaint lodged by Plaintiff's mother regarding the incident that is the subject of this lawsuit.  Plaintiff contends that Honick was never disciplined for this "sustained" complaint – or even notified of OMI's decision.  (Honick Depo. 130:25-131:17, ECF No. 39-11.)  Even if that is the case, however, it is of no evidentiary moment because it is clear that the City's failure to discipline or train Honick following his use of force in the instant case cannot have been the proximate cause of Plaintiff's injury.  *See Sallie,* 2012 WL 995245, at *10 ("It is beyond reproach that neither contemporaneous nor subsequent conduct can supply the pattern of violations needed to provide notice to municipal policymakers and an opportunity to conform to constitutional requirements.") (*citing Connick v. Thompson*, 131 S. Ct. 1350, 1361 n.7 (2011)).

The other complaint against Honick that was sustained by the OMI involved a 2007 incident in which Honick had been photographed apparently stepping on an arrestee's upper shoulder/head area while the subject was handcuffed.  (Defs.' Ex. 2, ECF No. 39-2; Defs.' Ex. 3 at p. 7, ECF No. 39-3.)  The Bureau's Use of Force Instructor concluded that Honick's technique of using his foot to stabilize the subject was "not the best way to do it" but did not constitute an excessive use of force.  (Defs.' Ex. 2. at p. 1.)  The OMI investigator considered Honick's restraint technique to be "more like a 'trophy pose." (*Id.*)  While this incident did not result in a "sustained" complaint of excessive force, Honick's actions were deemed to be "conduct unbecoming a member of the Bureau of Police." (*Id.*)  As a result of this incident, Honick's commanding officer recommended a written warning.  This disciplinary measure was later changed by Defendant Harper to an oral warning and remedial training with the approval of the City's Public Safety Director.  (*Id.*)  Notwithstanding these measures, Plaintiff states that there is

31

no documentation in Honick's personnel file of the oral reprimand being issued (Pl.'s Br. Opp. Mot. Summ. J. at 7 n.2, ECF No. 36), and Honick could not recall ever receiving the remedial training that was ordered by Harper.  (Honick Depo. 134:20-135:13, ECF No. 39-11.)

This evidence does little to support Plaintiff's municipal liability claim.  To begin, it does not demonstrate that Honick violated the subject's constitutional rights and cannot, therefore, serve as part of "[a] pattern of similar constitutional violations" as is "'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Sallie,* 2012 WL 995245, at *9 (*quoting Connick,* 131 S. Ct. at 1360).  Nor does the incident support the conclusion that Honick's misconduct went unpunished pursuant to an established practice or custom within the Bureau of Police; on the contrary, Honick's personnel record reflects the misconduct and Harper's order that Honick receive an oral reprimand and remedial training.  Plaintiff claims that these punishments were never actually meted out but, even if that is true, there is nothing in the record to suggest that Harper knew of, and acquiesced in, the Bureau's failure to enforce the disciplinary measures.  *See Fletcher v. O'Donnell*, 867 F.2d 791, 793–94 (3d Cir. 1989) ("Custom may be established by proof of knowledge and acquiescence.").  Consequently, Plaintiff has not produced evidence demonstrating that the Bureau's failure to carry out the discipline that Harper ordered was *itself* a well-established practice or custom, as opposed to an aberration or oversight.

Plaintiff also points to records of Honick's use of force that were generated as part of the Bureau's COMPSTAR Reports.  (*See generally* Defs.' Ex. 4, ECF No. 39-4.)  The COMPSTAR Reports were generated pursuant to a consent decree that the City of Pittsburgh entered into with the Department of Justice after the DOJ accused the City of having "a pattern of illegal searches, illegal stops, and a secondary issue [of] use of … excessive force, particularly in minority

communities…" (Brackney Depo.73:3-7, ECF No. 39-14.)  Pursuant to the five-year consent decree, the Bureau had to issue reports every three months "about officers who through the computer system … are having indicators, that they have submitted so many discretionary arrests, they have used force so many times…"  (*Id*. at 73:17-20.)  Plaintiff points out that, between the first quarter of 2009 and the second quarter of 2011, Honick reportedly punched civilians eight times; four of these were to the subject's face, one was to the ribs, and the location of the other three cannot be determined based on the reports submitted.  (Defs.' Ex. 4 at pp. 3, 5, 11, 15, and 31.)  Plaintiff places special significance on the incidents involving punches to the head or face because Harper acknowledged that blows to a person's face or head with a closed fist can constitute deadly force. (Harper Depo. at 93:11-18, ECF No. 39-12.)

Having reviewed this evidence, the Court finds that it does not materially advance Plaintiff's municipal liability claim.  To start, two of the eight reports of punching involved incidents that post-date the events in question here and therefore have little, if any, relevance to the municipal liability analysis.  As to the other six incidents, the Court notes that each one involved a use of force by Honick that was determined to be within the Bureau's guidelines and/or no action was recommended in light the circumstances involved.  (*See* Defs.' Ex. 4 at pp. 3, 5, 11, and 15.)  As Plaintiff observes, these reported incidents "were reviewed by every level of command at the City of Pittsburgh Bureau of Police and were specifically designed to assist in identifying and responding appropriately to constitutional violations by officers."  (Pl.'s Br. Opp. Mot. Summ. J. at 9, ECF No. 36 (citing Brackney Depo. at 73-75, ECF No. 39-14).)  However, nothing that Plaintiff has identified in the COMPSTAR reports suggests that Honick's use of force in the cited instances was inappropriate, much less unconstitutional.  This fact is significant because a theory of municipal liability premised upon a failure to train or discipline ordinarily

requires the plaintiff to show inaction on the part of municipal policymakers in the face of a pattern of constitutional violations similar to the type being alleged by the plaintiff. *See Sallie,* 2012 WL 995245, at *8 ("Municipal policymakers are required to be on actual or constructive notice that a particular omission in the entity's training is causing employees to violate citizens' constitutional rights. ... It is the decision not to change course after gaining such notice that propels the adherence to the chosen course of action, in effect a 'policy of inaction,' to the 'functional equivalent of a decision by the [policymakers] to violate the Constitution.'") (*quoting Connick,* 131 S.Ct. at 1360) (internal citation to *Connick* omitted) (alteration in the original).  No such showing has been made here.

In addition, the COMPSTAR reports fail to support a reasonable inference of deliberate indifference on the part of Harper and/or the City relative to the constitutional rights of those individuals with whom Honick was likely to come into contact.  Plaintiff acknowledges that "[o]fficers [like Honick] who were identified in COMPSTAR reports were subject to heightened monitoring and supervision," (Pl.'s Br. Opp. Mot. Summ. J. at 9, ECF No. 36 (citing Brackney Depo. at 73-75, ECF No. 39-14)), and, to reiterate, the COMPSTAR reports "were reviewed by every level of command at the City of Pittsburgh Bureau of Police and were specifically designed to assist in identifying and responding appropriately to constitutional violations by officers."  (*Id.* (citing Brackney Depo. at 73-75.)   As of May 2011, Honick's commanding officer noted that he had been monitored for at least six quarters with no problems indicated; in August 2011, Honick's commanding officer recommended that the monitoring cease.  (Defs.' Ex. 4 at pp. 28, 31.)  Far from supporting an inference that the City consciously disregarded a risk of harm to the public by failing to adequately supervise or monitor Honick, the COMPSTAR

34

records are affirmative evidence of the City's attempt to prevent constitutional deprivations of the sort that Plaintiff is complaining of here.

Plaintiff also points to a portion of Harper's testimony as evidence that supposedly supports his municipal liability claim. According to Plaintiff, Harper "was aware that Honick had a habit of punching people in the face and that something should have been done about it." (Pl.'s Br. Opp. Mot. Summ. J. 8, ECF No. 36.) In actuality, Harper's deposition transcript sets forth the following exchange:

> Q.  [D]o you have a recollection in your capacity as the Chief of Police of receiving information that Officer Honick was accused on several occasions of striking citizens in the face with a closed fist either in his capacity in secondary employment or during regular patrol duties?  Do you recall that being reported to you?
>
> A.  After reviewing [the COMPSTAR Report for Defendant Honick], yes.
>
> Q.  Now, with respect to that information reported to you, can you tell me any precautions that you may have taken to ensure that Officer Honick was not using unreasonable force when he was alleged to have struck people in the face with a closed fist.
>
> A.  Yes.  He would have been sent back for retraining for use of force at the police academy and his reports on use of force would all have been reviewed by his supervisors.
>
> Q.  Do you know for a fact that that happened or are you asserting that that's what you thing happened?
>
> A.  At this time, that's what I believed happened, that he was sent back for remedial training at the academy.  That would have been our procedure.
>
> Q.  Your belief is that that is what occurred because you believe that's what should have occurred.
>
> A.  That's correct.
>
> Q.  It's not based upon an independent recollection today that that in fact occurred.
>
> A.  That's correct.

(Harper Depo. 94:24-95:23, ECF No. 39-12.)

Plaintiff contends that, notwithstanding Harper's testimony that Honick should have been retrained in the proper use of force, the retraining never occurred. Assuming this is true, the Bureau's failure to retrain Honick is insufficient to evidence a practice or custom of deliberate indifference to the rights of private citizens when considered in light of the record as a whole. Here, the record is silent as to why Honick was never retrained, and there is no evidence to suggest that Harper was aware of, and acquiesced in, the failure to retrain Honick. At most, Harper's testimony establishes that the failure to retrain Honick actually *contravened* the Bureau's official policy.

To the extent Plaintiff is arguing that the failure to retrain Honick *was itself the official policy* (as opposed to an aberrant departmental oversight)*,* his municipal liability claim fares no better. Courts have observed that "'a municipality's culpability for depriving rights is at its most tenuous where a claim turns on a failure to train.'" *Sallie,* 2012 WL 995245, at 8 (*quoting Connick*, 131 S. Ct. at 1359); *see also Oklahoma City v. Tuttle,* 471 U.S. 808, 822-23 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' is 'far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell.*'"). To prevail on such a theory, Plaintiff must show that "[m]unicipal policymakers are … on actual or constructive notice that a particular omission in the entity's training is causing employees to violate citizens' constitutional rights." *Sallie,* 2012 WL 995245, at *8 (citing *Connick,* 131 S. Ct. at 1360). As the Supreme Court has stated:

> [a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train. … Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability. … Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be

said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick,* 131 S. Ct. at 1360 (internal citations and quotation marks omitted).  Here, Plaintiff has submitted evidence that Honick frequently used force in connection with his duties, but Plaintiff has failed to demonstrate that Honick engaged in a pattern of an *unconstitutional* use of force as might support a finding of municipal liability consistent with the foregoing principles.

Plaintiff also points to Harper's acknowledgement that Honick could have been prohibited from working bar details as a means of taking precautionary measures against the possibility that Honick would use excessive force towards citizens, since the use of force is more likely to occur in a bar setting.  (Harper Depo at 94-95, ECF No. 39-12.)  Accepting this evidence at face value, it supports, at most, a finding of negligence on the part of the City rather than the higher scienter standard of deliberate indifference to the rights of private citizens which is required for §1983 liability.  As we have noted, "[d]eliberate indifference is a stringent standard of fault, requiring proof that municipal actor disregarded a known or obvious consequence of his action." *Connick,* 131 S. Ct. at 1359 (internal quotation marks and citation omitted).  *See also Brown,* 520 U.S. at 407 ("A showing of simple or even heightened negligence will not suffice" to establish municipal liability under §1983.).  In the absence of a pattern by Honick of violating citizens' rights to be free from excessive force, Plaintiff cannot show that the City, through Harper, was deliberately indifferent to a known or obvious risk that Honick would violate the rights of citizens with whom he came into contact.

In sum, Plaintiff has failed to produce sufficient evidence from which a jury could reasonably conclude that the City, through Harper, maintained an official policy, practice or custom that served as the moving force behind Honick's alleged use of excessive force in this

Case 2:12-cv-01453-DSC   Document 44   Filed 02/18/15   Page 38 of 40

case.  The Court further notes that Plaintiff has not attempted to demonstrate the City's liability relative to his First Amendment claim against Honick or his Fourth Amendment excessive force claim against White.  Accordingly, summary judgment will be entered in favor of the City and Defendant Harper with respect to Plaintiff's remaining §1983 claims.


### IV. Conclusion

For the reasons stated above, the pending motion for partial summary judgment will be granted with respect to all claims against Defendants Kail, Smolinski, Lebedda, Harper, and the City of Pittsburgh.  In addition, Defendants' motion will be granted with respect to Plaintiff's state and federal claims premised on false arrest and malicious prosecution.  In all other respects, the motion will be denied.  An appropriate order follows.


Cercone, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TAYLOR CONDARCURE**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:12cv1453 |
| | ) | **Electronic Filing** |
| **CITY OF PITTSBURGH, CHIEF OF** | ) | |
| **POLICE NATHAN HARPER,** | ) | |
| **OFFICER DAVID HONICK, OFFICER** | ) | |
| **MATTHEW WHITE, OFFICER R.** | ) | |
| **SEMONLINSKI, DETECTIVE** | ) | |
| **LEBEDDA, OFFICER M. KAIL,** | ) | |
| **SR STATION SQUARE LLC** t/d/b/a | ) | |
| **SADDLE RIDGE SALOON** and/or | ) | |
| **SR PITT LLC** t/d/b/a **SADDLE RIDGE** | ) | |
| **SALOON** and **SADDLE RIDGE** | ) | |
| **SALOON, INC.,** | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER OF COURT**

AND NOW, this 18th day of February, 2015, upon consideration of Defendants' Motion

for Summary Judgment (**Document No. 31**) Plaintiff's response thereto, the briefs and

appendices filed in support thereof, pursuant to this Court's Memorandum Opinion filed

herewith,

IT IS HEREBY ORDERED that the Motion Summary Judgment is granted in part and

denied in part. The motion is **GRANTED** with respect to:  (i) all claims asserted against

Defendants Kail, Smolinski, Lebedda, Harper, and the City of Pittsburgh; and (ii) all state and

federal claims premised on theories of false arrest and malicious prosecution. Final judgment

pursuant to Rule 58 will be entered in favor of Defendants and against Plaintiff with respect to said claims.  In all other respects, the Defendants' motion is **DENIED**.


                                           s/ David Stewart Cercone
                                           David Stewart Cercone
                                           United States District Judge


cc:     Margaret Schuetz Coleman, Esquire
        Michael E. Kennedy, Esquire
        Bryan Campbell, Esquire

        (*Via CM/ECF Electronic Mail*)